**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| | : |
| DOW CORNING CORPORATION, | : Hon. Faith S. Hochberg |
| and HEMLOCK SEMICONDUCTOR | : |
| CORPORATION, | : Civil Case No. 09-5637 (FSH) (PS) |
| | : |
| Plaintiffs, | : **OPINION & ORDER** |
| | : |
| v. | : Date: November 23, 2010 |
| | : |
| BB&T CORPORATION and SCOTT & | : |
| STRINGFELLOW, LLC, | : |
| | : |
| Defendants. | : |
| | : |

**HOCHBERG, District Judge:**

## I.      INTRODUCTION

Plaintiffs Dow Corning Corp. and Hemlock Semiconductor Corp. bring this lawsuit alleging that they were induced to invest in auction rate securities by defendants' material misrepresentations and omissions concerning the market, in violation of Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 promulgated thereunder, and the Michigan Uniform Securities Act.  They also assert state common law claims for fraud, negligent misrepresentation, and breach of fiduciary duty.  Plaintiffs are corporate citizens of Michigan. Defendants are BB&T Corp. and Scott & Stringfellow, LLC.  BB&T is a citizen of North Carolina.  Scott & Stringfellow is a wholly owned subsidiary of BB&T.  Defendants move to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.      SUMMARY OF THE ALLEGATIONS

The following is a summary of the allegations in the amended complaint, which the Court must accept as true for the purposes of this motion. Also summarized below are matters of public record and undisputedly authentic documents upon which plaintiffs' claims are based, which the Court may consider when evaluating a motion to dismiss.

A.    **Auction Rate Securities**

Plaintiffs Dow Corning and Hemlock Semiconductor are corporations that invested their cash and current assets in auction rate securities ("ARS"). Defendant BB&T is one of the nation's leading financial services firms. Defendant Scott & Stringfellow, a wholly owned subsidiary of BB&T, is a registered broker-dealer. Most of defendants' alleged contacts with plaintiffs relevant to this action were through the broker Mr. Jeff Boyd, an employee of Scott & Stringfellow, who operated out of its New Jersey and Florida offices. Defendants have provided investment and cash management services to plaintiffs since at least 2002.

ARS are long-term bonds whose interest rates are periodically reset through a bidding process known as a Dutch auction. They are based on the debt obligations of pools of loans, such as student loans, residential mortgages, or municipal bonds. Dutch auctions for ARS typically occur every 7, 14, 28, or 35 days.   At a Dutch auction, bids with successively higher interest rates are accepted until an interest rate is reached at which the number of "buy" orders matches the number of "sell" orders, at which point the auction is concluded and the ARS are sold. That interest rate is called the "clearing rate." However, if there are not enough bids at auction to buy all the ARS, the auction "fails," and the holders of the ARS must await the next auction in order to sell them. ARS are typically only sold at auction; there is no established

secondary market for them.  In the event of auction failure, each ARS pays interest at a rate established in its prospectus, unless the issuer redeems it.

Plaintiffs allege that defendants were underwriters in the ARS market and served as the managing broker-dealer for many ARS auctions.  When acting as the sole manager, defendants allegedly would be the only firm that could submit bids at an auction, both for their own clients and for other broker-dealers.  Plaintiffs contend that, in that capacity, defendants had inside knowledge about the auctions and the market for ARS.  For example, plaintiffs allege that defendants knew but did not disclose to plaintiffs information about the identities of bidders, the number of bids, the rates at which bids were made, or the dollar amounts of bids made at ARS auctions.

Prior to an auction, broker-dealers would survey investor interest and give guidance to investors, called "price talk," which included a range of rates within which they believed the auction would clear.  Price talk allegedly enabled broker-dealers to influence the clearing rate at auctions they managed, because they could consider whether investors were placing bids above the price talk.  In turn, that would influence whether the broker-dealer would submit a support bid to ensure that the auction cleared, and at what rate.  Defendants allegedly did not disclose to plaintiffs that they would submit support bids to ensure that auctions would clear or clear at a certain rate; plaintiffs claim they believed that the ARS auctions were clearing at all times due to the ordinary market forces of supply and demand.

ARS are subject to maximum rate restrictions – *i.e.*, an absolute cap on the interest or dividend that a security will pay.  That means that the potential payment obligations of the issuer are decreased if the maximum rate is low.  Setting low maximum rates therefore makes

it easier for an ARS issuer to obtain a high-quality, investment-grade AAA rating from a ratings agency on its ARS.  Plaintiffs allege that these low maximum rates were not adequately disclosed.  Another effect of a low maximum rate is that, in the event of auction failure, the issuer is less likely to redeem the ARS.  Plaintiffs invested in ARS with low maximum rates. Partly as a result, many of plaintiffs' ARS have not been redeemed by the issuers.

###### B. The Alleged Fraud

Plaintiffs allege that one of their principal investment objectives is liquidity. Defendants allegedly marketed ARS to plaintiffs as highly rated, highly liquid, and secure investments that were equivalent to cash.  They allegedly represented that ARS auctions rarely failed.  Plaintiffs allege that defendants were aware of their investment objectives and knew that plaintiffs purchased ARS due to their purported safety and liquidity.

Mr. Boyd, a broker with Scott & Stringfellow, had a long-standing relationship with plaintiffs.  Throughout 2007 and until February 13, 2008, Mr. Boyd submitted bids on plaintiffs' behalf to purchase ARS at auction.  According to the amended complaint, Mr. Boyd knew that he was expected to monitor the market and keep plaintiffs apprised of the safety and liquidity of ARS, which involved an assessment of the true supply and demand in the ARS market.

Plaintiffs claim that Mr. Boyd had discretionary authority to make trades in ARS and would inform plaintiffs on a daily basis as to what trades he had made on their behalf. Plaintiffs also allege that some of the time they purchased ARS based on defendants'

recommendations.[1]  Plaintiffs further allege that, beginning some time prior to 2005 and continuing until February 13, 2008, defendants sold ARS to plaintiffs, presumably at auction. Although each issuance of ARS is described in a prospectus, Mr. Boyd allegedly did not provide plaintiffs with the prospectuses associated with his purchases of ARS on plaintiffs' behalf.

      The risk of auction failures increased dramatically from Fall 2007 until February 13, 2008, when the ARS market is alleged to have collapsed.  Consequently, plaintiffs allege, defendants increased their support bids substantially during this period.  As their support bids increased, so also did defendants' portfolio of ARS.  This in turn allegedly increased defendants' need to unload their own ARS on other market participants, including plaintiffs.  Nevertheless, defendants allegedly continued to create a false impression of supply, demand, and liquidity in the ARS market by making undisclosed support bids, and Mr. Boyd continued to advise plaintiffs to buy ARS while the market deteriorated.  Plaintiffs also allege that defendants were motivated to prevent auction failure and to conceal the true state of supply and demand in the ARS market by their desire to generate underwriting fees, auction management fees, and commissions and to maintain favorable business relationships with ARS market participants, including issuers and investors.

      Defendants allegedly knew or should have known from Fall 2007 through February 13, 2008 that ARS were no longer safe, highly liquid investments.  That is, plaintiffs claim, because the defendants knew that bids submitted by brokers, rather than investors, were keeping ARS auctions from failing.  Plaintiffs allege that defendants nevertheless misrepresented

---

[1]    Plaintiffs' counsel explained at oral argument that sometimes Mr. Boyd would recommend certain ARS to plaintiffs, whereas at other times he would buy it on plaintiffs' behalf without their prior consent.  Tr. 81:17-20.

the risk that auctions would fail and continued to market ARS to plaintiffs as before.  In support,

they specify eleven communications from Mr. Boyd during this period concerning the state of the

ARS market:

1.      On November 7, 2007, Mr. Boyd forwarded Ms. Heather Szafranski, a securities trader at

        Dow Corning, a news story reporting that Fitch, a ratings agency, might downgrade

        FGIC, one of the so-called monoline insurance companies.  He allegedly wrote,

> Heather, we have one bond FIGC [sic] insured and will be selling that on the 7th.
> If you would like me to review the other portfolio's [sic] I will be happy to do so.
> JB  We don't use FIGC [sic] for any of our bonds.  (Am. Compl. ¶ 35.)

2.      On November 20, 2007, in response to a question from Mr. Jan Hjalber, the Treasurer of

        Dow Corning, concerning a recent increase in interest rates in the "muni market," Mr.

        Boyd allegedly replied,

> Jan, Very Good to hear from you!  Rates are very good for us!  I have looked at
> this 5 different ways.  Trying to make sure there are no surprises.  Have been on
> several conference calls and the same outcome.  The basis [sic] answer is 2 fold. .
> For us the first one is the amount of tax free buyers is dwarfed by people who can
> only buy taxable (institutionally-size) and the actual $$market arena is being
> spooked into treasuries as evidenced by the huge inversion of 2yr notes (3.15%)
> and funds (4.25%) would love to cover this with you further and provide whatever
> supporting materials you need.  (Am. Compl. ¶ 63.)

3.      On December 17, 2007, Mr. Boyd emailed Ms. Szafranski, forwarding a news story

        reporting that Moody's, a ratings agency, had reaffirmed high ratings for two of the

        monoline insurance companies.  He allegedly wrote,

> Good news for Ambac and MBIA.  Ratings for the two ins. providers we hold
> were affirmed AAA.  Ambac especially and MBIA affirmed with neg outlook but
> still AAA.  If you want to discuss this please let me know.  Also pls pass this info
> on to Jan [Hjalber].  (Am. Compl. ¶ 64.)

4.      On January 8, 2008, Mr. Boyd allegedly told Dow Corning's risk controller, Mr. Mark

Looker, that plaintiffs' ARS holdings were "very safe" and emphasized to Mr. Looker

and Ms. Szafranski that the student loan-backed ARS were much safer than those that

were insured by the monoline insurance companies.  (Am. Compl. ¶ 56.)

5.      On January 24, 2008, in response to a question from Mr. Hjalber about student loan-

backed ARS, Mr. Boyd allegedly wrote,

> basically the way it works is each state originates the loans and the Dept. of
> Education guarantees the loans through different programs.  You could call it a
> subsidy.  The purpose is obviously to promote the US college programs.  Yes, the
> states are responsible to manage each individual program and the D.O.E. has
> established guidelines for maintaining the guarantee.  The D.O.E. is *Not* a
> sponsored agency like Freddy Mac or Fannie Mae.  The Guarantee the D.O.E.
> provides comes with the full faith and credit of the United States.  **The equivalent
> of U.S. Treasury bonds**.  (Am. Compl. ¶ 66.) (emphasis in original)

6.      On January 29, 2008, Mr. Boyd forwarded to Mr. Looker a news story reporting that

certain monoline insurers, Ambac and MBIA, were being downgraded by Fitch.  (Am.

Compl. ¶ 67.)

7.      On January 30, 2008, Mr. Boyd forwarded to Mr. Looker two news stories reporting that

Fitch had reaffirmed a AAA rating for a different monoline insurer, Dexia.  He allegedly

wrote, "Mark, some good insurance news for a change."  (Am. Compl. ¶ 68.)

8.      On February 1, 2008, in response to an email from Mr. Hjalber expressing concerns about

the ARS market and asking whether there had been auction failures in the "muni market

where we invest," Mr. Boyd allegedly replied,

> Good morning Sir, I was waiting for this one. : )  BMY [Bristol Meyers Squibb]
> bo[ough]t subprime backed auction product (chasing yield) our space is not that
> product and as you point out what exposure we could have theoretically we have
> addressed.  And continue to do so.  I will say even the FGIC and XL (already

7

downgraded) issues are clearing no problem.  Issuers are raising caps to accommodate the downgrades so things seem to be taking all this into account.  I hope the shareholders don't have anything similar to BMY investments.  I can only help them with your blessing. : ) Was planning on covering this on the 25th but with all the news let me know if you want me to update reporting.  By the way CNBC talking a group of 8 banks stepping in to capitalize MBIA and Ambac. (only insurers we have left) ands [sic] we sold 35MM yesterday without a hiccup. (Am. Compl. ¶ 72.)

9.      On February 1, 2008, Mr. Boyd allegedly wrote in an email to Mr. Looker,

** Good news on the auction front *** Mark, we can discuss this later.  JB (I think my point got across to them!) : ) With the crazy markets and monoline news, we have seen attractive yields on auction rate securities.  One wrinkle has been what is known as the 'maximum rate'.  The maximum rate is the highest rate that can be set on any given auction.  Sometimes it is a flat rate of say 12% or 15%; but on other auctions it is set by using a calculation based on BMA, T-Bill, CP Index, etc. . .  The maximum rate rarely comes into play – but in some cases we have seen the 'maximum rate' become a below market rate (for example NC ST ED yesterday had a max. rate of 4.95, but the previous auction was 5.10) – good news; both N.C. ST ED and S.C. Student Loan have gotten waivers to raise the 'max rate' until 3/31/08!  (Am. Compl. ¶ 73.)

10.     On February 11, 2008, Mr. Boyd forwarded to Mr. Hjalber a news article about the

decreasing risk of monoline insurance companies defaulting on their debts.  He allegedly

wrote, "**I know exactly what happened and why** . . . Do you want to talk to me today or

tomorrow?"  (Am. Compl. ¶ 78.) (emphasis in original)

11.     On February 13, 2008, Mr. Boyd allegedly emailed Mr. Looker, "with today's headlines I

imagine its [sic] going to be a [sic] interesting day.  I should have price talk on all these

shortly.  That will be a first indicator of how things will go.  Will update you soon.  JB."

(Am. Compl. ¶ 81.)

        Plaintiffs contend that these statements are materially false or misleading because

they portray the ARS market as liquid and omit to state that, in fact, it had been illiquid since Fall

8

2007.  The ARS auctions were allegedly clearing during this time solely because they were artificially propped up by the practice of defendants and other broker-dealers to place support bids for ARS for the purpose of ensuring that the auctions would clear.  Cessation of this artificial support at any time, plaintiffs claim, would have resulted in the immediate failure of the ARS market.  That is what occurred on February 13, 2008.  Without full and truthful disclosure, plaintiffs were allegedly left to conclude from Mr. Boyd's statements that the ARS market was liquid during this period and that normal market forces were sustaining it.  Plaintiffs further contend that some of these communications falsely implied that any problems in the ARS market were limited to those ARS insured by the monoline insurance companies and not student loan-backed ARS.

On February 14, 2008, after the ARS market collapsed, Mr. Hjalber demanded to know when auctions began to fail or to be propped up by brokers.  On the same day, Mr. Boyd allegedly replied,

> Jan, in our space (student loan) as far as I know the first one occurred last week. There were failed student loan asset backed deals and sub prime stuff that may have experienced some problems the week before . . . but much earlier?  What does that mean like a month ago?  No. . We have so many bonds rolling daily and our first problem was Friday.  **If there was a problem any earlier we would have been the first to know**.  Think about it. . even with all the insured paper we were trading and the news being what it is we never had a problem selling those on neg. credit watch.  I have already received the accounting treatment for our type securities and am putting a presentation together for you.  Due to the fact that at this time it is felt this is a temporary situation it could take up to a year for these to be qualified as impaired and long term rates are well below ours.  (Am. Compl. ¶ 83.)  (emphasis in original)

Plaintiffs allege that this representation was false because the ARS market actually became illiquid by Fall 2007.

When the ARS market collapsed, plaintiffs became unable to sell their ARS holdings. At that time, plaintiffs allegedly held approximately $641,800,000 of ARS.[2] The ARS market remains illiquid, rendering it impossible to sell ARS except at a steep discount.

### C.   Public Information

On May 31, 2006, following an investigation into certain practices by broker-dealers, underwriters, and auction managers in the ARS market, the SEC issued a consent cease-and-desist order concerning some of the activities that form the basis of this action (the "2006 SEC Order"). The 2006 SEC Order is a matter of public record and is available online at the SEC's website: http://www.sec.gov/litigation/admin/2006/33-8684.pdf. Neither defendant was a party to the 2006 proceedings before the SEC or the 2006 SEC Order.

Among other things, the 2006 SEC Order described the practice by certain broker-dealers of submitting support bids to prevent auction failures. In its findings, the SEC noted,

> Without adequate disclosure, certain Respondents bid to prevent auctions from failing. Failed auctions occur when there are more securities for sale than there are bids for securities and result in an above-market rate described in the disclosure documents. These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate. ... To the extent that certain practices affected the clearing rate, investors may not have been aware of the liquidity and credit risks associated with certain securities.

2006 SEC Order, at 6 & n.5. The 2006 SEC Order "does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed." *See id.* at 6 n.6. One of the parties to the 2006 SEC Order was Merrill Lynch, from whom Dow Corning also claims to have

---

[2]   Counsel for defendants represented at oral argument that certain ARS issuers have redeemed the securities, with the result that, of the $641.8 million in ARS at issue, plaintiffs currently hold under $400 million. *See* Tr. 23:3-5.

purchased ARS.  Dow Corning has a separate lawsuit against Merrill Lynch pending in the

Southern District of New York.

Defendants have submitted news reports indicating that in 2005, around the time

the SEC's investigation was ongoing, accounting firms began to recommend that companies re-

classify their ARS holdings as investments rather than cash equivalents.  One article cited the

position of PriceWaterhouseCoopers that the shift "reflects the risk that buyers of auction-rate

debt will have to hold the securities longer than they had intended."  Haworth Cert., Ex. 21.

Corning, Inc.[3] apparently reclassified its ARS holdings at this time from cash equivalents to

investments.  Its Treasurer, Mr. Mark Rogus, was quoted in the article as saying, "We buy these

securities because they offer us a more attractive short-term yield than other securities. ... I'm not

planning on changing my investment actions because accountants tell us we need to put these in

another bucket."  *Id.*

The publicly available prospectuses for several (but not all) of the ARS purchased

by plaintiffs disclose, among other things, that ARS may entail liquidity risk and that broker-

dealers may place support bids to prevent auction failures.  For example, the prospectus for the

Educational Funding of the South, Inc. Senior 2007-1 A-11 Bonds (Cusip no. 28148XBA8), into

which plaintiffs allegedly invested $34.9 million, provides in relevant part:

> A Broker-Dealer may purchase 2007-1 Auction Bonds for its own account, but it is not
> obligated to do so.  In the event that there were insufficient Orders for the 2007-1
> Auction Bonds and an Auction failed, the rate for the 2007-1 Auction Bonds would be
> the Maximum Rate, which might be a rate less than the prevailing market rate for
> similar bonds.  Existing Holders may not be able to sell some or all of their 2007-1
> Auction Bonds at an Auction for the 2007-1 Auction Bonds if the Auction fails, that is,

---

[3]        Dow Corning is a joint venture between Corning Inc. and Dow Chemical Co.

11

if there are more 2007-1 Auction Bonds offered for sale than there are Potential
Holders bidding for 2007-1 Auction Bonds.

Educational Funding of the South, Inc., Student Loan-Backed Bonds, Series 2007-1 Official

Statement, at xiv-xv, *available at* http://emma.msrb.org/MS265075-MS240383-MD469234.pdf.

## III.   PROCEDURAL HISTORY

Plaintiffs filed suit on November 4, 2009.  When defendants informed Magistrate

Judge Shwartz that they intended to file a motion to dismiss in lieu of an answer, Judge Shwartz

ordered defendants to submit a letter to plaintiffs on February 10, 2010, identifying the perceived

deficiencies in the complaint.  In response, plaintiffs filed an amended complaint on March 10,

2010.  Defendants now move to dismiss the amended complaint.

## IV.   STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007));

*see also Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) ("[S]tating . . . a claim

requires a complaint with enough factual matter (taken as true) to suggest the required element.

This does not impose a probability requirement at the pleading stage, but instead simply calls for

enough facts to raise a reasonable expectation that discovery will reveal evidence of the

necessary element.") (internal quotations omitted).  When considering a motion to dismiss under

*Iqbal*, the Court must conduct a two-part analysis.  "First, the factual and legal elements of a

claim should be separated. The District Court must accept all of the complaint's well-pleaded

facts as true, but may disregard any legal conclusions.  Second, a District Court must then

determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (internal quotations and alterations omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

Because plaintiffs bring claims for securities fraud, the amended complaint must satisfy the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story' – that is, the 'who, what, when, where and how' of the events at issue." *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 148 (3d Cir. 2004) (quoting *In re Rockefeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

For securities fraud claims, the PSLRA further requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and

13

belief, the complaint shall state with particularity all facts on which that belief is formed. ...  In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1)-(2).

## V.      DISCUSSION

First, defendants move to have the claims against BB&T (the parent company of Scott & Stringfellow) dismissed on the grounds that the amended complaint does not allege any wrongdoing by BB&T itself or by its employees.  With respect to Scott & Stringfellow, defendants argue that the amended complaint fails to state a claim on six principal grounds: (1) it fails to plead fraud adequately under Rule 9(b) and the PSLRA; (2) it is barred by the statute of limitations; (3) the Michigan Uniform Securities Act does not apply to secondary market transactions; (4) it fails to plead breach of fiduciary duty adequately; (5) it fails to plead common law fraud adequately; and (6) it fails to plead negligent misrepresentation adequately.

### A.      The Claims Against BB&T

The amended complaint contains no allegations whatsoever that describe conduct by BB&T or its employees concerning ARS.  Instead, as reflected in the Court's recitation of the allegations, the amended complaint ascribes much of the conduct at issue to both BB&T and Scott & Stringfellow under the name "defendants."  "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"  *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 492 (D.N.J. 1998) (quoting *Mills v. Polar Molecular*

14

*Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  The only person specifically alleged to have made

any misrepresentations or material omissions to plaintiffs is Mr. Boyd, an employee of Scott &

Stringfellow.[4]  As a registered broker-dealer, Scott & Stringfellow could underwrite and manage

ARS auctions.  BB&T is a bank holding company, not a registered broker-dealer.  Accordingly,

the Court will construe references to "defendants" in the amended complaint as references to

Scott & Stringfellow and its employees.

Plaintiffs concede that they do not know (and cannot allege) what involvement, if

any, BB&T had with the events described herein.  *See* Opp'n at 29-30; Tr. 36:12-13.  They

contend that BB&T's knowledge of the alleged fraud and involvement in it are facts entirely in

control of defendants, and that the claims against BB&T should not be dismissed without

discovery.  That is not a basis to deny a motion to dismiss, particularly in a case governed by the

PSLRA, which imposes a stay of discovery when the sufficiency of the complaint is challenged.

*See* 15 U.S.C. § 78u-4(b)(3).  Defendants' motion to dismiss the claims against BB&T is granted

without prejudice.[5]

**B.**    **Federal Claims**

1.    <u>Failure to State a Claim Under Section 10(b) and Rule 10b-5</u>

---

[4]    Although BB&T is the sole shareholder of Scott & Stringfellow, corporate parents
are not liable for the torts of their subsidiaries absent a basis to pierce the corporate veil.  *See*
*United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998).  There are no allegations in the amended
complaint that would supply a basis to pierce the veil, such as undercapitalization.

[5]    If discovery subsequently reveals a factual basis to re-join BB&T as a defendant,
plaintiffs may seek leave to amend their complaint at that time, if they can meet the PSLRA
pleading standards as to BB&T.

Defendants argue that plaintiffs failed to plead securities fraud with the particularity required by Rule 9(b) and the PSLRA.  To state a claim for material misstatements or omissions under Section 10(b) and Rule 10b-5, plaintiffs must plead that defendants "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security[6] (4) upon which plaintiffs reasonably relied and (5) that plaintiffs' reliance was the proximate cause of their injury."  *In re Alpharma*, 372 F.3d at 147 (quoting *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)) (alterations omitted). The Court will begin its analysis with scienter.

       *i.*     *Scienter*

Under the PSLRA, plaintiffs must plead with particularity facts giving rise to a "strong" inference of scienter.  *See* 15 U.S.C. § 78u-4(b)(2).  Plaintiffs meet this heightened threshold if, considering the amended complaint as a whole, together with facts of which the Court may take judicial notice, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  It is no longer sufficient in this circuit for a plaintiff to plead only that the defendant had the motive and opportunity to commit fraud.  *Inst'l Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 276-77 (3d Cir. 2009).  A court considering the sufficiency of scienter allegations must "weigh the 'plausible nonculpable explanations for the defendant's conduct' against the 'inferences favoring the plaintiff.'"  *Id.* at 267 (quoting *Tellabs*, 551 U.S. at 324).

---

      [6]     Defendants do not dispute in their brief that the allegedly misleading statements were made in connection with the purchase or sale of a security.

16

Plaintiffs have alleged two sets of facts that they argue give rise to a strong

inference of scienter.  First, plaintiffs allege that defendants' actions were undertaken because

they wished to earn commissions and fees from the ARS market and to maintain favorable

business relationships with various market players, including ARS issuers and investors.  (Am.

Compl. ¶ 46.)  These motives are common to all for-profit enterprises and are therefore

insufficient, without more, to give rise to a strong inference of scienter.  *See In re Citigroup*

*Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009); *cf. Inst'l Investors Grp.*, 564

F.3d at 278 ("Motives that are generally possessed by most corporate directors and officers do

not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual

defendants resulting from this fraud.") (quotations and alterations omitted).

Plaintiffs also allege that defendants concealed their knowledge of the increasing

illiquidity in the ARS market and their growing use of undisclosed support bids to prevent

auction failure because they needed to keep that market alive in order to have a market in which

to unload their own ARS holdings on investors, including plaintiffs.  (Am. Compl. ¶ 58.)  From

Fall 2007, when the ARS market began to deteriorate, through February 13, 2008, when it

collapsed, defendants allegedly increased their support bids, which in turn increased their

inventory of ARS.  Plaintiffs allege that defendants, due to their positions in some ARS auctions

as auction managers, knew who was submitting bids at auction.  As a result, plaintiffs allege that

defendants knew that demand for ARS by investors was shrinking and that other broker-dealers

were correspondingly increasing the volume of their support bids to prevent auction failures.

The Court can reasonably infer from these allegations, which are presumed true for the purposes

of a 12(b)(6) motion, that defendants would have known that the ARS market was deteriorating

and would be illiquid if broker-dealers ceased making support bids.  Due to the deteriorating

ARS market, defendants allegedly needed to unload their own inventory of ARS on investors,

such as plaintiffs, in order to reduce their own exposure before the ARS market entirely

collapsed.  Plaintiffs contend that this motivated defendants to mislead them concerning the

illiquid state of the ARS market and defendants' own activity on their proprietary accounts.

       Accepting as true, for the purposes of this motion only, that defendants (1) knew

that the ARS market would be illiquid without intervention by brokers beginning in Fall 2007

and (2) held large inventories of ARS, which they needed to sell, "it is quite reasonable to infer

that [defendants] then had a motive to conceal the ARS illiquidity risk from customers to whom

[they] hoped to sell ARS from [their] own portfolio."  *Defer LP v. Raymond James Fin., Inc.*,

No. 08 Civ. 3449(LAK), 2010 WL 3452387, at *5 (S.D.N.Y. Sept. 2, 2010).  Plaintiffs do not

allege whether defendants actually unloaded (or attempted to unload) their own inventory of

ARS.  "[O]missions and ambiguities [in the complaint] count against inferring scienter."

*Tellabs*, 551 U.S. at 326.  However, the identities of participants in the ARS market were

allegedly opaque and not readily ascertainable if one was not a broker-dealer.

       Plaintiffs allege that defendants continued to increase their ARS inventory

through February 13, 2008.  (Am. Compl. ¶ 51.)   That allegation could lead to at least two

different inferences: (1) that defendants were (wrongly) bullish on the ARS market; or (2) that

defendants took the risk of increasing their own long positions in ARS to keep the market from

complete collapse and to buy time for an orderly disposition of their holdings.  The former would

be a possible nonculpable explanation for defendants' allegedly inaccurate assurances regarding

the state of the ARS market, *see In re Citigroup*, 700 F. Supp. 2d at 305, and the latter a plausible

culpable motive, particularly when the other facts alleged do not suggest a bullish state of mind

by defendants, but rather concealed knowledge of looming illiquidity.

Defendants rely on *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 700 F. Supp. 2d

453 (S.D.N.Y. 2010), to argue that the culpable inference is less compelling than the nonculpable

one.  In *Ashland*, the plaintiff alleged that Morgan Stanley purchased ARS to create the illusion

of a liquid market to deceive plaintiff, knowing that such purchases were essential to maintaining

liquidity in the market for Morgan Stanley-brokered ARS.  *Id.* at 459.  The *Ashland* court

commented in dicta that this Ponzi scheme-like motivation ascribed to Morgan Stanley, even if

sufficiently pled, would have been "economically irrational," because by buying up ARS to

create the illusion of a liquid market to deceive plaintiff, Morgan Stanley would have also put

itself in an illiquid position.  *Id.* at 469.

However, this Court is not persuaded that the culpable inference is economically

irrational in this case.  It would not be economically irrational to attempt to pump up investor

demand for ARS and to conceal the risk of auction failure from Fall 2007 through February 13,

2008 in an attempt to buy enough time to exit the ARS market, as defendants are alleged to have

done.  *See Defer LP*, 2010 WL 3452387, at *5.  By the same token, the allegations do not support

a strong inference of scienter for conduct occurring before Fall 2007, since the ARS market at

that time was not yet alleged to be illiquid.  Having weighed the culpable inference against the

nonculpable inference based on the facts, as alleged, the Court concludes that plaintiffs have

adequately pled scienter for those alleged material misrepresentations or omissions that occurred from Fall 2007 through February 13, 2008.[7]

*ii.*     *Actionable Statements or Omissions*

It is a violation of Section 10(b) and Rule 10b-5 "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  Since the Court has determined that the amended complaint adequately alleges scienter with respect to statements made from Fall 2007 through February 13, 2008, it will only consider alleged misstatements and omissions that occurred during that period.  *See Defer LP*, 2010 WL 3452387, at *9.

Plaintiffs identify eleven communications from Mr. Boyd from Fall 2007 through February 13, 2008 that they allege are misleading, in violation of Section 10(b) and Rule 10b-5. These are the communications between Mr. Boyd and Mr. Hjalber, Mr. Looker, and Ms. Szafranski, which allegedly took place on November 7, 2007, November 20, 2007, December 17, 2007, January 8, 2008, January 24, 2008, January 29, 2008, January 30, 2008, February 1, 2008 (twice), February 11, 2008, and February 13, 2008.  Mr. Boyd allegedly represented that plaintiffs' ARS holdings were "very safe" and "clearing no problem."  The emails from Mr. Boyd are generally positive about the ARS market, reporting, *e.g.*, "Good news on the auction front," and "Rates are very good for us!"  Mr. Boyd allegedly compared the guarantee on the student loan debt underlying plaintiffs' ARS to be "[t]he equivalent of U.S. Treasury bonds."

---

[7]     This opinion should not be read to limit discovery solely to that time period if discovery from other time periods is reasonably calculated to lead to admissible evidence.

Plaintiffs allege that these statements were false or contained material omissions for the same reason: they did not state that the ARS market at that time would be illiquid absent intervention by brokers (including defendants).  An omission is material under Section 10(b) and Rule 10b-5 if a reasonable investor would find that it "significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  In addition, "[t]o be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002).  The alleged fact that the ARS market was illiquid, absent intervention by brokers, from Fall 2007 through February 13, 2008, when the statements were made, undoubtedly would have been material.

Defendants contend that some of these communications concerned different types of securities than student loan-backed ARS or addressed default risk rather than credit risk.  Even if true, Mr. Boyd nonetheless would have been obligated to inform defendants of the allegedly known and serious liquidity risk associated with student loan-backed ARS, when offering positive commentary about the ARS market in general, in order to make those statements not misleading.  The truth, half-truth, or significance of Mr. Boyd's statements will be addressed in their full context at a future time with the aid of a factual record, when the merits are considered.

### iii.   *Reasonable Reliance*

Defendants argue that the amended complaint does not sufficiently allege reasonable reliance on the alleged misstatements.  "The 'reasonable reliance' element of a Rule 10b-5 claim requires a showing that the plaintiff exercised that diligence that a reasonable person

21

would have exercised to protect his interests." *Osio v. DeMane*, Nos. 05-2283 & 05-2280(JLL), 2006 WL 2129460, at *5 (D.N.J. July 24, 2006).  To determine whether plaintiffs have sufficiently alleged reasonable reliance, the Court should consider the allegations concerning: "(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information." *AES Corp. v. Dow Chemical Co.*, 325 F.3d 174, 178-79 (3d Cir. 2003).

  <u>Prongs 2 and 5:</u>  Both of these prongs concern what information was available to plaintiffs that should have led them not to rely on any alleged misstatements or omissions. Defendants' principal argument is that news articles from 2005 reporting the change in accounting treatment of ARS from cash equivalents to investments, the 2006 SEC Order, and several of the prospectuses for plaintiffs' ARS holdings publicized the risk that auctions might fail and the practice of brokers to submit support bids to prevent auction failures – the very facts supposedly concealed by defendants. *See In re Citigroup*, 700 F. Supp. 2d at 307 (holding that the plaintiff's alleged reliance on integrity of ARS market was unreasonable where publicly available sources "all disclosed that Defendants could engage in the very conduct of which Plaintiff complains").  That argument is not persuasive as a basis for dismissing this case. Plaintiffs allege that defendants concealed the fact that the ARS market was illiquid, absent intervention by broker-dealers, from Fall 2007 through February 13, 2008.  The publicly available information cited by defendants did not inform plaintiffs that Scott & Stringfellow and other broker-dealers were, as alleged, using a crescendo of support bids to prop up an illiquid market in the Fall of 2007 through February 13, 2008.

Prong 1: Whether a fiduciary relationship existed between the parties cannot be resolved on the pleadings, as discussed below.

Prong 3: Plaintiffs are large, sophisticated corporate investors. *See Ashland v. Morgan Stanley*, 700 F. Supp. 2d at 471 (holding that it was unreasonable for sophisticated corporate investor to rely on alleged misstatements "in the absence of performing any diligence, prior to investing tens of millions of dollars"). However, that is mitigated in this case by the fact that, as alleged, due diligence by plaintiffs would not have revealed the truth underlying the alleged misleading statements; allegedly only broker-dealers knew or could know that the ARS market was illiquid, absent intervention by those broker-dealers.

Prong 4: The relationship between the parties allegedly dates back to 2002.

As this discussion suggests, applying the factors set forth in *AES* to the allegations in the amended complaint does not conclusively show that plaintiffs' reliance was unreasonable as a matter of law. It is for the trier of fact to weigh these considerations and determine whether plaintiffs' reliance on the alleged misstatements and omissions was "reasonable" under the circumstances.

### iv.     *Loss or Loss Causation*

Defendants contend that plaintiffs have not alleged a cognizable "loss" because the ARS are merely illiquid, not valueless – they are still paying interest according to the terms of their respective prospectuses. Some (but not all) of plaintiffs' ARS have been redeemed by the issuer. This reasoning likely reduces the measure of damages, but it is not a basis to dismiss the amended complaint for failure to allege a loss due to plaintiffs' inability to sell the ARS. It stands to reason that if there is currently no market for a security, it is worth less now than it was

prior to February 13, 2008, when there was a market.  *See United States v. Fletcher*, 562 F.3d 839, 844 (7th Cir. 2009) (commenting that "an illiquid asset is worth less than a liquid one").

2.   <u>Statute of Limitations</u>

The statute of limitations for securities fraud expires upon the earlier of "(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).  Plaintiffs filed suit on November 4, 2009.  The parties entered into a 90-day tolling agreement on July 31, 2009.  Thus, claims arising from any alleged acts or omissions prior to August 6, 2004 are time-barred.  Claims arising from any alleged acts or omissions thereafter are timely unless plaintiffs discovered, or in the exercise of reasonable diligence should have discovered, the facts constituting the particular violation before August 6, 2007.  *See Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1795-96 (2010).  The statutory phrase "facts constituting the violation" means all elements of securities fraud, including scienter.  *Id.* at 1796.

Defendants argue that plaintiffs were on notice of the facts constituting the alleged fraud in May 2006 at the latest because it was public knowledge, through the 2006 SEC Order and the 2005 change in accounting standards, that broker-dealers were permitted to submit support bids and that ARS were not cash-equivalents due to the risk of auction failure.  That argument is unavailing.  The statute of limitations does not begin to run until a claim accrues.  *See O'Connor v. City of Newark*, 440 F.3d 125, 129 (3d Cir. 2006) (recognizing "the common-sense proposition that an applicable statute of limitations begins to run at the time the claim accrues").  One of the elements necessary for plaintiffs' 10b-5 claim to accrue is the existence of one or more misleading statements.  The alleged misleading statements by Mr. Boyd

24

that are identified in the amended complaint occurred between November 7, 2007 and February 13, 2008; all of them were allegedly made after August 6, 2007.  Assuming, without deciding, that the two-year statute of limitations began to run when Mr. Boyd allegedly made those statements, this lawsuit is sufficiently timely to proceed beyond a motion to dismiss.

### B.   State Law Claims

#### 1.   Choice of Law

In considering plaintiffs' claims arising under state law, the Court must first decide what state's law applies to each claim, as alleged.  A federal court applying state law "must apply the law of the forum state, including its choice of law rules." *Barbey v. Unisys Corp.*, 256 F. App'x 532, 533 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941)).  In tort cases, the New Jersey Supreme Court has adopted the "most significant relationship" test for conducting the choice of law analysis.  *See Cooper v. Samsung Elecs. Am., Inc.*, 374 F. App'x 250, 254-55 (3d Cir. 2010) (citing *P.V. v. Camp Jaycee*, 962 A.2d 453 (N.J. 2008)).  Under this test, where a conflict of laws exists, New Jersey will apply the law of the state where the injury occurred unless another state has a more significant relationship to the dispute.  *Id.*   Because the alleged injury to plaintiffs in this case is economic (the value of their ARS investments), it is deemed to have occurred in the state where plaintiffs have their principal place of business.  *See* Restatement (Second) of Conflict of Laws § 148, cmt. i; *cf. Fu v. Fu*, 733 A.2d 1133, 1141 (N.J. 1999) (commenting that in the choice of law analysis the injury is often deemed to occur in the state where the plaintiff resides).  Mr. Boyd allegedly operated out of the New Jersey and Florida offices of Scott & Stringfellow.  Thus, where a conflict of laws

exists, the Court will apply Michigan law unless New Jersey or Florida has a more significant relationship to this case.

Plaintiffs are alleged to have relied on defendants' misrepresentations in a different state (Michigan) than where the misrepresentations were allegedly made (New Jersey or Florida). Accordingly, the Court must consider the following factors to determine whether New Jersey or Florida has a more significant relationship to the case than Michigan: "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant." *Cooper*, 374 F. App'x at 255 (citing Restatement (Second) of the Conflict of Laws § 148(2)). According to the amended complaint, factors (a), (b), and (f) weigh in favor of Michigan law. Factor (d) weighs in neither direction, and factor (e) is inapplicable. Accepting as true the allegations in the amended complaint, neither New Jersey nor Florida has a more significant interest in applying its law to this dispute than Michigan, the state where the injury allegedly occurred. The Court will apply the law of Michigan to determine whether the state law counts state a claim for relief.

2.    The Michigan Uniform Securities Act

The Michigan Uniform Securities Act (the "Michigan Act") establishes civil liability for "[a]ny person who ... [o]ffers or sells a security by means of any untrue statement of a

26

material fact or any omission to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they are made, not misleading, the buyer not

knowing of the untruth or omission, and who does not sustain the burden of proof that he or she

did not know, and in the exercise of reasonable care could not have known, of the untruth or

omission."  Mich. Comp. Laws § 451.810(a)(2).[8]  Defendants are alleged to have sold ARS to

plaintiffs.  (Am. Compl. ¶¶ 14, 15, 30, 76.)

       Defendants argue that the Michigan Act should be interpreted to apply only to

initial sales of securities and not to re-sales of securities in the secondary market.  The Michigan

Act does not expressly limit its applicability to initial sales.  However, defendants note that the

language of the Michigan Act strongly resembles – and is modeled after – Section 12(a)(2) of the

Securities Act of 1933.  *See Sheldon Co. Profit Sharing Plan & Trust v. Smith*, 858 F. Supp. 663,

672-73 (W.D. Mich. 1994).  The Securities Act of 1933, as interpreted by the Supreme Court,

applies only to initial sales of securities by an issuer and not to secondary market transactions.

*See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575-78 (1995).  Defendants are not alleged to be

ARS issuers; their alleged sales of ARS to plaintiffs, if any, would have occurred on the

secondary market.

       "A federal court under *Erie* is bound to follow state law as announced by the

highest state court."  *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010) (quoting

*Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 (3d Cir. 2007)).  The parties have not cited any

decisions by the Michigan Supreme Court construing the Michigan Act.  However, cited

---

[8]     Although Mich. Comp. Laws § 451.810(a)(2) has been superceded by a new
version, it remains in effect for events occurring prior to October 1, 2009.  *See* Mich. Comp.
Laws § 451.2703(1).

decisions by Michigan federal district courts have applied the Michigan Act to secondary market transactions. *See Knapp v. Patel*, No. 1:91-CV-957, 1992 WL 415384, at *6 (W.D. Mich. Sept. 2, 1992) ("The Court's review of Michigan cases arising under Section 410(a)(2) [codified as § 451.810(a)(2)], however, indicates that no distinction is made between initial and secondary offerings in analyzing these causes of action.") (citing federal cases); *Kirkland v. E.F. Hutton & Co.*, 564 F. Supp. 427, 444 (E.D. Mich. 1983). The Court declines to predict, on the current record, that the Michigan Supreme Court would limit liability under the Michigan Act to initial sales of securities. Defendants' motion to dismiss this Count is denied.

### 3.   Breach of Fiduciary Duty

Defendants contend that this count should be dismissed because no fiduciary relationship existed between themselves and plaintiffs. Under Michigan law, the existence of a fiduciary duty between a broker and client is determined by whether the trading account is discretionary or non-discretionary. "In a non-discretionary account, the customer, rather than the broker, determines which purchases and sales to make and no fiduciary relationship arises. In a discretionary account, the broker does not need customer authorization before making a transaction, and has a fiduciary relationship with the customer." *Vestax Sec. Corp. v. Desmond*, 919 F. Supp. 1061, 1072 (E.D. Mich. 1995) (internal citations omitted).[9]

Defendants argue that plaintiffs' trading account was non-discretionary and attach to their motion certain trading authorizations from Dow Corning and Hemlock Semiconductor

---

[9]     New Jersey law is in accord with Michigan. *See S.E.C. v. Pasternak*, 561 F. Supp. 2d 459, 506 (D.N.J. 2008) ("The crux of a fiduciary relationship is the relinquishment of control and discretion by the customer."). Florida imposes a limited fiduciary duty on a broker of a non-discretionary account. *See Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1049 (11th Cir. 1987).

and a terms and conditions document prepared by Scott & Stringfellow and executed by

Hemlock Semiconductor.  The terms and conditions document states, in relevant part, "Client

understands that the Firm is not acting in a fiduciary capacity on Client [sic] behalf.  Client is

responsible for making all investment decisions for securities purchased, held or sold in the

Account."  No terms and conditions document executed by Dow Corning has been submitted.

The parties do not dispute the authenticity of any of these documents.

   The trading authorizations do not expressly state that the account is non-

discretionary; instead, they list the persons who are authorized to make trading decisions on

plaintiffs' behalf.  Mr. Boyd is not among those so authorized.  Defendants' argument would

require the Court to infer from these documents that all the trading accounts were non-

discretionary. That inference is inappropriate on a motion to dismiss; it is for the trier of fact,

with the aid of testimony and other supporting evidence, to make or reject that inference.

   Even if the trading accounts were non-discretionary, Michigan courts recognize

that a broker of a technically non-discretionary account can, in some cases, usurp control of

investment decisions, making the account discretionary.  *See Vestax*, 919 F. Supp. at 1072-73.

Plaintiffs allege that Mr. Boyd made all the investment decisions regarding ARS.  (Am. Compl. ¶

37.)  Michigan courts consider the following factors to determine whether a broker has usurped

control over a technically non-discretionary account: (1) "the age, education and intelligence and

investment experience of the customer;" (2) whether "the broker was socially or personally

involved with the customer;" (3) whether "many of the transactions occurred without the

customer's prior approval;" and (4) whether "the broker and the customer speak frequently with

each other regarding the status of the account or the prudence of a particular transaction."  *Id.*

This is a fact-intensive inquiry that is best not decided on the pleadings, particularly since a claim for breach of fiduciary duty need not be alleged with the same specificity as a claim under the PSLRA. *See Lautenberg Found. v. Madoff*, No. 09-816 (SRC), 2009 WL 2928913, at *15 (D.N.J. Sept. 9, 2009).

If a fiduciary duty existed, the allegation that defendants concealed the illiquidity of the ARS market from plaintiffs from Fall 2007 through February 13, 2008 in order to unload their own ARS holdings on them would state a claim for a breach of that duty. Defendants' motion to dismiss this claim is denied.

4.    Common Law Fraud and Negligent Misrepresentation

The elements of common law fraud under Michigan law are: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Unibar Maint. Servs., Inc. v. Saigh*, 769 N.W.2d 911, 920 (Mich. Ct. App. 2009) (quotations omitted). The elements of negligent misrepresentation in Michigan are: (1) a false representation; (2) negligently made; (3) inuring to the benefit of defendant; (4) privity of contract between plaintiff and defendant; and (5) justifiable reliance by plaintiff to his detriment. *See id.* at 919. Because the amended complaint states a claim for securities fraud based on one or more misrepresentations during the period from Fall 2007 through February 13, 2008, it states a claim for common law fraud and negligent misrepresentation during this period.

VI.    **CONCLUSION & ORDER**

For the reasons set forth in this opinion, defendants' motion to dismiss is

**GRANTED IN PART AND DENIED IN PART**.  The amended complaint states a claim under

federal and state law with respect to the conduct of Scott & Stringfellow during the period from

Fall 2007 through February 13, 2008.  The claims against BB&T are **DISMISSED WITHOUT**

**PREJUDICE**.


   /s/ Faith S. Hochberg
Hon. Faith S. Hochberg, U.S.D.J.